IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2021

IN RE KAELYN R.

**Appeal from the Circuit Court for Hamblen County**
**No. 19CV112, 19CV70     Alex E. Pearson, Judge**

———————————————————

**No. E2020-01254-COA-R3-PT**

———————————————————

A mother appeals the termination of her parental rights to her daughter. The trial court concluded that there was clear and convincing evidence that the mother had abandoned her child by wanton disregard and by committing severe child abuse against her. The court also concluded that the evidence was clear and convincing that termination of parental rights was in the child's best interest. We agree and affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which KENNY W. ARMSRONG and KRISTI M. DAVIS, JJ., joined.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, Brittany R.

Herbert H. Slatery III, Attorney General and Reporter, and Lexie A. Ward, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

**A.**

In January 2019, the Tennessee Department of Children's Services ("DCS") received a report of a possible drug-exposed child. When a Child Protective Services Investigator looked into the claim, she found the child, Kaelyn, and her mother, Brittany R. ("Mother"), living in a one-bedroom home with two other adults. When the investigator began discussing the allegations with Mother, Mother fled via the back door with the four-

month-old child. The investigator enlisted law enforcement to look for Mother and the child without success.

The following day, the investigator received a phone call from the mother of one of Mother's male acquaintances. The child had been left with the caller, and Mother was in jail on check forgery charges.

When she met with Mother at the jail, the investigator found it difficult to keep Mother's attention because she kept nodding off. Mother admitted to the investigator that she had smoked marijuana the preceding day and had smoked or used methamphetamine about two days prior to her arrest. Mother consented to a drug screen, which was positive for marijuana and methamphetamine but also amphetamines and morphine.

DCS petitioned the Hamblen County Juvenile Court to find the child dependent and neglected and to award it temporary legal custody. The juvenile court granted DCS temporary custody on an emergency basis and ordered that Mother have no contact pending further hearing.

Although Mother remained incarcerated, DCS developed a family permanency plan with her input. Among other things, the plan called for a hair follicle test to be performed on Kaelyn. The hair follicle test, conducted on March 28, 2019, revealed that Kaelyn had been exposed to methamphetamine sometime in the previous three months. Methamphetamine was present at levels twenty-six times that ordinarily required for a positive result.

The permanency plan also placed several responsibilities on Mother, such as participating in therapeutic visitation, scheduling and completing an alcohol and drug assessment, submitting to random drug screens, and resolving all legal issues and refraining from incurring additional charges. But DCS's efforts to assist Mother in carrying out her responsibilities were hampered in two ways. First, DCS had difficulty communicating with Mother. The initial case manager, who was involved with the case from Kaelyn's removal until October 2019, reported only being able to discuss plan responsibilities with Mother about ten times. She was able to meet with Mother three times while Mother was incarcerated, but once she was out, Mother often did not return telephone calls or respond to text messages. The next case manager reported that Mother would not return her telephone calls or text messages. She eventually was able to contact Mother in December 2019 through Facebook Messenger.

Second, Mother could not avoid time in jail. She was in jail for approximately a week after her arrest for forgery charges. She was incarcerated again from March 15 to May 27, 2019, in Hamblen County. And she spent May 28, 2019, in another jail for violation of probation arising from a previous conviction.

2

Also in May, the juvenile court adjudicated Kaelyn dependent and neglected. The juvenile court found by clear and convincing evidence that Mother had committed severe abuse by exposing Kaelyn to methamphetamine. The court ordered that Mother, upon her release from jail, could have supervised visitation on two conditions. Mother had to provide proof to the court that she had been clean of methamphetamine for thirty days, and she had to provide proof of enrollment in a rehabilitation program.

B.

Mother appealed the dependency and neglect decision, but on September 18, 2019, before the appeal could be heard,[1] DCS petitioned the Hamblen County Circuit Court to terminate Mother's parental rights. The petition alleged three grounds for terminating Mother's parental rights: abandonment by an incarcerated parent, severe child abuse, and failure to manifest an ability and willingness to assume custody or financial responsibility of her child.

At trial,[2] Mother explained her struggles with drug use and the circumstances leading up to Kaelyn's removal. Mother had an older child who was removed by DCS following an automobile accident in 2016. The child spent approximately two years in foster care. According to Mother, "that's when [she] started doing drugs really." She used heroin and morphine almost every day.

After surrendering her parental rights to her older child, Mother decided "to get clean because [she] did not want [the child] to think that [she] was a junkie." She went through a treatment program. And she claimed sobriety for a time, including while she was pregnant with Kaelyn. But then Mother relapsed. She attributed the relapse to an abusive boyfriend. She used methamphetamine with the boyfriend and then again after she moved out. Although she could not be sure, Mother conceded the second instance of her use was shortly before Kaelyn's removal.

After Mother's release from jail on May 29, 2019, she moved from place to place. Her longest stay at any one place was "probably a month or two," although she could not recall the address of any place where she stayed. Mother also resumed taking drugs, both methamphetamine and marijuana, which she attributed to losing custody of Kaelyn. She estimated that, by the fall of 2019, she was using methamphetamine daily. The DCS case

---

[1] DCS also petitioned to terminate the parental rights of the man Mother claimed to be the father of Kaelyn. His parental rights, if any, are not at issue.

[2] The circuit court consolidated the hearing on the appeal of the dependency and neglect proceeding with the trial on the petition to terminate. We have previously highlighted the problems that can arise with such an approach. *See In re Envy J.*, No. W2015-01197-COA-R3-PT, 2016 WL 5266668, *5-6 (Tenn. Ct. App. Sept. 22, 2016). Although the parties and the court seemed to have avoided such problems in this instance, the better course is to keep the proceedings distinct. *Id.* at *6.

manager at the time said Mother described herself as "pretty bad strung out" during that period.

But a turning point occurred on November 26, 2019. Mother remembered that date because it was the day she found out she was pregnant again. According to Mother, she "went to rehab probably two days later."

In December 2019, Mother attended a rehabilitation program in Nashville. She maintained that she completed the thirty-day program in nineteen days. Mother then returned to Morristown where she started another rehabilitation program. She left that program for a residential treatment program that specialized in "moms who are pregnant or parenting and . . . struggling with addictions." Mother started the program on February 6, 2020, and other than a two-week absence to be with family, she had been in the program ever since.

The rehabilitation program director also testified. She explained that, normally, the program would last until three months after the mother gave birth, but the program could be extended if needed. When asked how Mother was progressing, the program director reported that Mother was doing "really well." She elaborated:

> The way we track progress at [the program] is that we – Each mom has to complete A & D assignments. They also have to complete women's treatment. And then they have to complete a Treatment Plan. And they do all of this before we do their Aftercare Plan, which means what they're going to be doing once they leave [the program]. [Mother] has completed at least seventy percent of her Treatment Plan, which puts her right on the spot where she's supposed to be in the program. She's been a leader while she's been there. She's never missed her IOP. We don't have to go wake her up or tell her to come. She's always where she needs to be without being asked. So, she's done really well while she's there. We have no concerns for her at all. She's passed all of her drug screens since she's been there.

The program director was also asked about Mother leaving the program for two weeks to be with family. The program director agreed that such absences can be therapeutic, especially given the anxiety caused by the COVID-19 pandemic. The program director felt that Mother had been able to maintain her sobriety during her absence.

The circuit court terminated Mother's parental rights. DCS conceded in closing argument that it had not proven failure to manifest an ability and willingness to assume custody or financial responsibility as a ground for terminating Mother's parental rights. But the court found clear and convincing evidence that Mother had abandoned Kaelyn by engaging in conduct prior to her incarceration that exhibited a wanton disregard for the child's welfare. And the evidence was clear and convincing that Mother had committed

4

severe child abuse by exposing Kaelyn to methamphetamine. The court also determined that there was clear and convincing evidence showing that terminating Mother's parental rights was in the child's best interest.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. The government's interest in the welfare of a child justifies interference with a parent's constitutional rights in certain circumstances. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2020).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard*

*T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

On appeal, Mother argues only that the trial court erred in concluding that it was in Kaelyn's best interest to terminate her parental rights. But in parental termination cases, we must review the trial court's findings and conclusions as to each ground for termination it relies on, even if the parent does not challenge such findings and conclusions. *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016). So we review the trial court's termination of Mother's parental rights on the grounds of abandonment by wanton disregard and severe child abuse.

1. Abandonment By Wanton Disregard

The court found Mother had abandoned Kaelyn under a definition of "abandonment" applicable to parents who were incarcerated when the petition to terminate was filed or at any point during the four-month period preceding the filing of the petition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). At the time DCS filed its petition to terminate,[3] the incarcerated or formerly incarcerated parent was deemed to have abandoned her child if, among other things, she "ha[d] engaged in conduct prior to incarceration that exhibit[ed] a wanton disregard for the welfare of the child." *Id.* 36-1-102(1)(A)(iv) (2017).

The court found that Mother was incarcerated "during the relevant 4 month window in that [Mother] was incarcerated at the Hamblen County Jail from March 15, 2019, until May 27, 2019, and was then transferred to Cocke County Jail for a felony violation of probation until May 28, 2019." And the court found that "exposing the child to methamphetamines . . . and . . . [Mother's] testimony of her methamphetamine and other drug use" exhibited wanton disregard for Kaelyn's welfare.

"Wanton disregard" is not a defined term. Acts amounting to wanton disregard typically "reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). So "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). But the actions constituting wanton disregard must have occurred at a point in time when the parent

---

[3] Our Legislature amended this definition of "abandonment" in 2020. 2020 TENN. PUB. ACTS 43. We apply the version of the statute in effect at the time DCS filed its petition to terminate Mother's parental rights. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

had knowledge of the child's existence, which can include "a child *in utero*." *In re Anthony R.*, 2015 WL 3611244, at *3.

Clear and convincing evidence supports the court's finding that Mother's pre-incarceration conduct exhibited wanton disregard for Kaelyn's welfare. Although Mother denied using methamphetamine in her child's presence, the court did not accredit her testimony. And we defer to that determination. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). Given Mother's admission of methamphetamine use prior to the child's removal, we have no substantial doubt that Mother's use exposed Kaelyn to the drug. But even if there were doubt, Mother admitted that she learned that methamphetamine was being used in the home where she was living, and rather than separating herself from that environment, she decided to remain and use herself.

2. Severe Child Abuse

A parent's rights may be terminated if "[t]he parent . . . has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court . . . or is found by the court hearing the petition . . . to have committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4) Among other things, "severe child abuse" under Tennessee Code Annotated § 37-1-102 means:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

. . . .

(E) Knowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child[.]

*Id.* § 37-1-102(b)(27)(A)(i), (E) (Supp. 2020).

Generally, "[c]lear and convincing evidence of severe child abuse is present when a child is exposed to methamphetamine." *In re Caydan T.*, No. W2019-01436-COA-R3-PT, 2020 WL 1692300, at *5 (Tenn. Ct. App. Apr. 7, 2020) (citing *In re A.L.H.*, No. M2016-01574-COA-R3-JV, 2017 WL 3822901, at *5 (Tenn. Ct. App. Aug. 31, 2017) ("This Court has repeatedly held that exposure of a child to drugs constitutes severe child abuse.")). Here, Mother admitted to using marijuana and methamphetamine and that she knew that methamphetamine was being used in the home where she lived.

7

We conclude the evidence clearly and convincingly supports the finding that Mother committed severe child abuse. Kaelyn's hair follicle test showed exposure to significant levels of methamphetamine. And Kaelyn's foster mother testified that the child was suffering the consequences as a result of that exposure. Kaelyn had extremely sensitive hands and feet that delayed her ability to crawl and caused her to cry when anyone touched her. And she required both occupational and physical therapy after coming into foster care.

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even though two statutory grounds for termination were established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682.

After considering all of the statutory factors, the trial court determined that termination of parental rights was in the child's best interest. In doing so, it reasoned that six of the statutory factors weighed in favor of termination. In evaluating the first factor, the court found that "[g]iven the length of time that the child ha[d] been placed with the foster family, 506 days at the date of trial, . . . [Mother] had not yet made sufficient adjustment in circumstances or conditions to make it safe and in the best interest of [Kaelyn] to be in her home." *See* Tenn. Code Ann. § 36-1-113(i)(1). Although the court noted Mother's progress in the residential treatment program and hoped that Mother could remain "on her current track . . . and become a productive member of society," the court was troubled that Mother took a two-week leave from the program given her prior history of drug abuse.

We note further that Mother had not completed the treatment program and would only do so three months after she gave birth, at the earliest. Due to her late start at seeking assistance, she had not yet demonstrated her ability to stay clean for a meaningful time period outside of a treatment program.

The court found that, under the second factor, Mother "ha[d] not yet made a sufficient adjustment in circumstances or conditions to make it safe and in the best interest of [the] child to be in her home." *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social

8

services agencies for such duration of time that lasting adjustment does not reasonably appear possible"). Here, the court noted the time lost due to Mother's failure to work with DCS after her release from jail. The court found that she "routinely failed to maintain any level of consistent contact with the department." And in a familiar pattern, Mother fell deeper into drug use after her child's removal, only working toward recovery when she learned that she was pregnant with her third child.

The court addressed the third and fourth best interest factors, which focus on the parent's relationship with the child, together. The third factor considers the consistency of visitation. *Id.* 36-1-113(i)(3). The fourth factor asks "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). Kaelyn was approximately four months old when she went into foster care. And Mother had not seen Kaelyn since her removal. The court found the lack of visitation prevented any relationship from being established between Mother and her child. The foster parents were the only parents Kaelyn had known.

Under the fifth factor, the court determined "that changing Kaelyn's caretakers would be detrimental to her emotional and psychological well-being given the foster parents are the only parents she knows." *See id.* § 36-1-113(i)(5). The court found that Kaelyn was the only child in the foster parent's home and that she was now an established member of the family. The court accredited the foster mother's testimony "that both she and her husband are loving and supportive foster parents who want to adopt Kaelyn." The foster parents had demonstrated that support by taking Kaelyn to both physical and occupational therapy for weeks to address the child's developmental issues. The foster parents "provide[d] a very stable and supportive home environment and that [wa]s something that [Mother] simply ha[d] never been able to provide."

Finally, the court weighed the sixth statutory factor in favor of termination. The sixth factor asks whether the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child." *Id.* § 36-1-113(i)(6). As discussed above, the proof showed that Mother committed severe child abuse against Kaelyn by exposing her to methamphetamine.

On appeal, Mother does not contend that the evidence preponderates against any of the court's factual findings or that it improperly weighed the best interest factors. Instead, Mother complains that the court failed to specially address three of the statutory best interest factors in its analysis. She argues that each factor must be addressed in the court's order because, under the parental termination statutes, the court must "enter an order that makes specific findings of fact and conclusions of law." *Id.* § 36-1-113(k).

We find Mother's argument unavailing. The court's order makes specific findings of fact and conclusions of law. We do not read the parental termination statute, in requiring specific factual findings and legal conclusions, to obligate a court to make a reference to

every subsection of the statute in its best interest analysis. The statute does provide that the court "shall consider" the statutory best interest factors. *Id.* § 36-1-113(i). And our supreme court has held that "the court must consider all of the statutory [best interest] factors, as well as any other relevant proof any party offers." *In re Gabriella D.*, 531 S.W.3d at 682. But the court complied with that directive. The order provides that the court "carefully considered the factors as enumerated in Tenn. Code 36-1-113(i)."

In looking at the factors that the court did not specifically reference, factors seven, eight, and nine, we conclude that the court found those factors not applicable.[4] The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See* Tenn. Code Ann. § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). At the time of trial, Mother was living at the residential treatment facility, but that home was temporary. Mother would be departing in a matter of months after the birth of her child. In addressing other factors, the court touched on Mother's ability to be a safe and stable caregiver.

The eighth statutory factor evaluates the parent's mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). The ninth factor looks at the parent's child support history. *See id.* § 36-1-113(i)(9). No direct proof was offered regarding Mother's mental or emotional health. And, although the juvenile court did order Mother to pay nominal child support of $10.00 per month, no proof was offered concerning Mother's compliance with the order.

We agree with the court that the proven facts amount to clear and convincing evidence that termination was in Kaelyn's best interest. For termination to be in a child's best interest, not every factor has to apply. *State of Tenn. Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002). Such was the case here. The relevant factors dictated that terminating Mother's parental rights was in her child's best interests. *See In re Gabriella D.*, 531 S.W.3d at 682 (noting "the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case").

### III.

As conceded by Mother on appeal, the record contains clear and convincing evidence to support terminating Mother's parental rights on the two statutory grounds. The

---

[4] Mother makes no argument concerning the possible relevance of those factors.

10

record also contains clear and convincing evidence that termination is in the child's best interest.  So we affirm the termination of Mother's parental rights.

_s/ W. Neal McBrayer_
W. NEAL MCBRAYER, JUDGE